**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **GENERAL STAR NATIONAL INSURANCE COMPANY,** | ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) ) **No.: 14-cv-2455** |
| **FINANCIAL STRATEGY GROUP, PLC, FSG INVESTMENT MANAGEMENT, LLC MICHAEL ANDREW SHAUL, CLIFF PAESSLER, and ILINDA PARHAM,** | ) ) ) ) ) |
| **Defendants.** | ) ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, GENERAL STAR NATIONAL INSURANCE COMPANY (hereinafter "General Star"), by and through its attorneys, and for its Complaint for Declaratory Judgment against FINANCIAL STRATEGY GROUP, PLC, FSG INVESTMENT MANAGEMENT, LLC, MICHAEL ANDREW SHAUL, CLIFF PAESSLER, and ILINDA PARHAM (collectively, "Defendants"), states as follows:

## PARTIES

1.     General Star is a Delaware corporation with its principal place of business located in Connecticut.

2.     At all times relevant, General Star was authorized to do business and issue insurance policies in the State of Tennessee.

3.     At all times relevant, FINANCIAL STRATEGY GROUP, PLC ("FSG") was a company organized under the laws of the State of Tennessee, with its principal place of business located in Memphis, Tennessee.  FSG is subject to the jurisdiction of this Court.

4.      Upon information and belief, FSG INVESTMENT MANAGEMENT, LLC ("FSGIM") is a limited liability company organized under the laws of the State of Tennessee, with its principal place of business located in Memphis, Tennessee.  FSGIM is subject to the jurisdiction of this Court.

5.      Upon information and belief, MICHAEL ANDREW SHAUL ("Shaul") is a citizen of the State of Tennessee, intends to remain a citizen of Tennessee, and is subject to the jurisdiction of this Court.

6.      Upon information and belief, CLIFF PAESSLER ("Paessler") is a citizen of the State of Tennessee, intends to remain a citizen of Tennessee, and is subject to the jurisdiction of this Court.

7.      Upon information and belief, ILINDA PARHAM ("Parham") is a citizen of the State of Tennessee, intends to remain a citizen of Tennessee, and is subject to the jurisdiction of this Court.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(1) because all Defendants reside in Tennessee and one or more Defendants reside in this District and/or 28 U.S.C. § 1391(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## NATURE OF ACTION

10.     This action arises out of a controversy between the parties regarding Defendants'

request for insurance coverage pursuant to an Accountants Professional Liability Insurance Policy (subsequently defined as the "2013 Policy") issued by General Star to FSG as it relates to a lawsuit brought against Defendants and others captioned *Ronald K. Anderson, et al. v. BDO USA, LLP, et al.*, case no. CT 004388-137, filed on or about October 9, 2013 in the Circuit Court of Shelby County for the Thirteenth Judicial District at Memphis, Tennessee (the "Underlying Lawsuit").

11.    The plaintiffs in the Underlying Lawsuit generally allege that Defendants and others conspired and participated in a fee-generating scheme related to the design, marketing, promotion, sale and implementation of illegal and abusive tax shelters, called Distressed Debt Strategies ("DDS").   The Underlying Lawsuit alleges that Defendants and co-conspirators knowingly misled the underlying plaintiffs into believing the DDS was a valid and legal tax strategy and convinced them to purchase and implement the DDS, while Defendants knew or should have known the DDS were illegal and abusive tax shelters.  The Internal Revenue Service ("IRS") subsequently audited the underlying Plaintiffs, notified them that the DDS was an illegal and abusive tax shelter, disallowed the losses generated by the DDS and incorporated into the underlying Plaintiffs' tax returns, and assessed back taxes, interest, and penalties.

12.    General Star brings the instant action for declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 to declare the rights and obligations between the parties under the 2013 Policy as it relates to the Underlying Lawsuit. There exists an actual controversy between the parties that requires a declaration by this Court of the rights and obligations under the Policy.

13.    Specifically, General Star asks the Court to declare that there is no coverage and that General Star has no duty to defend or indemnify Defendants in the Underlying Lawsuit

pursuant to terms and conditions of the 2013 Policy.  General Star further requests that the Court rescind the 2013 Policy and declare the Policy void *ab initio* based on the material misrepresentations in the applications for the 2013 Policy.

## FACTUAL BACKGROUND

### The Application for the 2012 Policy

14.     On behalf of FSG, Shaul completed and signed an application that was submitted to General Star, dated August 25, 2012 (the "Application").  A true and correct copy of the Application (with certain financial information redacted) is attached hereto as **Exhibit A**.

15.     Shaul identified himself as "Member" in the Application.  Shaul was authorized to complete, sign, and submit the Application to General Star.

16.     Question 9 on the Application asked:

> **9.** Within the past 10 years, have your firm, firm affiliates, their predecessors in business or their personnel (on behalf of any of the foregoing) received fees or reciprocity in connection with the design, recommendation, sale or promotion of any income tax transaction which:
> a. Is specifically identified by the IRS as a tax avoidance transaction ("listed transaction") or is substantially similar to abusive tax shelters or transactions listed under the IRS Code?
> b. Or, any income tax transaction that is considered a reportable transaction under Treasury Regulation § 1.6011-4?
> *If yes, on a separate sheet describe any services rendered, estimate and/or describe the related fees or reciprocity received for each of the past 10 years, and provide copies of any opinion letter or any other materials used to promote this product/services.*

17.     Shaul, on behalf of FSG, responded "No" to both sub-questions (a) and (b) under Question 9.

18.     Question 21 on the Application asked:

> **21.** After inquiry of all owners, partners, officers and professionals of the firm and firm affiliates, within the past year have any past or present personnel:

*        *        *

    **c.** become aware of any act, omission, circumstances or fee dispute which might be expected to be the basis of a claim or suit?

19.    Shaul, on behalf of FSG, responded "No" to Question 21.

20.    Furthermore, the Application provided that, by signing the Application, FSG agreed to the following:

> **Applicant represents, after inquiry, that the information contained herein and in any attachments, supplemental applications or forms required hereby are true, accurate and complete, and that no material facts have been suppressed or misstated.**  Applicant acknowledges a continuing obligation to report to the Company as soon as practicable any material changes in all such information, after signing the application and prior to the issuance of the policy, and acknowledges that the Company shall have the right to withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance based upon such changes.
>
> Further, Applicant understands and acknowledges that:
> 1) If a policy is issued, the Company will have relied upon, as representations: this application, and any supplemental applications, and any other statements furnished to the Company in conjunction with this application, all of which are hereby incorporated by reference into this application and made a part hereof and
> 2) This application will be the basis of the contract and will be incorporated by reference into and made a part of such policy.

21.    On behalf of FSG, Shaul also completed and signed an "Accountants Professional Liability Supplemental Bridge Application," dated September 13, 2012 (the "Bridge Application").  A true and correct copy of the Bridge Application is attached hereto as **Exhibit B**.

22.    The Bridge Application stated, in pertinent part:

> **By signing this Supplemental Bridge Application, the undersigned, on behalf of the Applicant firm and all persons proposed for coverage, represents and agrees to each of the following five (5) items:**
>
> 1. The Applicant firm has made a comprehensive internal inquiry or investigation to determine whether any Applicant firm accountant is aware of any event, circumstance, situation or transaction that could

5

reasonably be expected to result in a claim, and have fully and completely divulged any and all such situations to the Company.

2. This Supplemental Bridge Application, along with the Applicant firm's most recent accountants' professional liability application and any required additional supplemental applications submitted to and accepted by the Company shall constitute the Application.

3. Each of the statements and answers given in the Application, are:

   a. Accurate, true and complete to the best of the Applicant firm's knowledge;
   b. No material facts have been suppressed or misstated;
   c. Representations the Applicant firm is making on behalf of all persons and entities proposed to be insured; and
   d. A material inducement to the Company to provide insurance and any policy by the Company is issued in specific reliance upon these representations.

23.    Shaul identified himself as "Member" in the Bridge Application.  Shaul was authorized to complete, sign, and submit the Bridge Application to General Star.

24.    In signing the Bridge Application, Shall declared "that the information submitted herein is true to the best of my knowledge and becomes a part of the Application."

25.    FSG submitted the Application and Bridge Application to General Star in order to obtain an insurance policy for the Policy Period of September 17, 2012 to September 17, 2013.

26.    In reliance upon the truth of the disclosures and representations made in the Application and the Bridge Application, General Star issued an Accountants Professional Liability Insurance Policy to FSG, Policy Number NJA697735, for the Policy Period of September 17, 2012 to September 17, 2013 (the "2012 Policy").

**The Renewal Application for the 2013 Policy**

27.    On behalf of FSG, Shaul also completed and signed a "Renewal Application," dated August 23, 2013 (the "Renewal Application").  A true and correct copy of the Renewal Application (with certain financial information redacted) is attached hereto as **Exhibit C**.

6

28.   Section 6 of the Renewal Application, entitled "Changes to Your Firm," asked a series of questions soliciting new, changed or previously undisclosed information on various topics covered by the Application and the Bridge Application.  Specifically, Section 6 stated, in pertinent part:

6.   <u>CHANGES TO YOUR FIRM</u>

**ANSWER "NO CHANGE" IF UNCHANGED IN THE PAST 12 MONTHS.  ANSWER "YES" IF NEW DURING THE PAST 12 MONTHS, OR IF NOT PREVIOUSLY REPORTED TO GENERAL STAR.**

\*        \*        \*

h)  Received commission, referral fees, reciprocity arising from the **sale, promotion or recommendation of securities, insurance products, real estate or other investments?**

\*        \*        \*

o) Know of **any circumstances which may result in a claim being made?**

29.   FSG answered "No change" to Items h) and o).

30.   Shaul identified himself as "Member" in the Renewal Application.  Shaul was authorized to complete, sign, and submit the Renewal Application to General Star.

31.   In signing the Renewal Application, Shall declared "that the information submitted herein is true to the best of my knowledge and becomes a part of my Professional Liability Application.  I understand that an incorrect or incomplete statement could void my protection."

32.   FSG submitted the Renewal Application to General Star in order to obtain the 2013 Policy.

**The 2013 Policy**

33.   In reliance upon the truth of the disclosures and representations made in the

Application, the Bridge Application and the Renewal Application, General Star issued a second

Accountants Professional Liability Insurance Policy to FSG, Policy Number NJA697735A, for

the Policy Period of September 17, 2013 to September 17, 2014 (the "2013 Policy"). The 2013

Policy was issued with a $1,000,000 limit of liability for each occurrence, and a $1,000,000 limit

of liability in the aggregate. FSG is the named Insured under the 2013 Policy. A true and

correct copy of the 2013 Policy (with certain financial information redacted) is attached hereto as

**Exhibit D**.

    34.    Section I of the 2013 Policy, entitled "Coverage," provides in relevant part:

    A.  **Damages**
Subject to the **Limits of Liability** and **Deductible**, we will pay on behalf of the Insured the **Damages** from **Claims** the Insured is legally obligated to pay resulting from **Wrongful Acts** to which this insurance applies.

    B.  **Claims-Made and Reported**
This insurance applies to a

    1.  **Claim;**

    2.  **Suit;**

    3.  **Legal Services Payment Request**; or

    4.  **Supplementary Payment Request,**

first made against the Insured during the **Policy Period**, or within sixty (60) days thereafter, or applicable Extended Reporting Period, and first reported by the Insured to us in writing during the **Policy Period**, or during the applicable Extended Reporting Period, arising out of a **Wrongful Act** that takes place in the **Coverage Territory:**

    5.  During the **Policy Period;** or

    6.  Prior to the **Policy Period** if:

      a.  The **Wrongful Act** took place on or after the **Retroactive Date**; and
      b.  At the Inception Date of the **Policy Period,** no Insured knew of any **Wrongful Act** that may reasonably be expected to give

8

rise to a **Claim** or **Suit** against an Insured.

35.    Among other items, the 2013 Policy defines "Claims" as a "demand for money, the filing of a **Suit** or the institution of arbitration or mediation proceedings, naming the Insured and alleging a **Wrongful Act**.  **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief or that portion of a proceeding seeking monetary relief that seeks injunctive or other non-pecuniary relief, except as defined by **Supplementary Payment Requests** and made available in Paragraph A. **Administrative Proceedings or Hearings** of **SECTION II – LEGAL SERVICES PAYMENTS**. "

36.    Among other items, the 2013 Policy defines "Suit" as "a civil adjudicatory proceeding(s) that is brought and maintained in a court of law in the United States of America, including its territories and possessions, Puerto Rico or Canada."

37.    The 2013 Policy defines "Damages" as follows:

> **Damages** mean those sums the Insured becomes legally obligated to pay as a result of:
>
> 1.    Compensatory judgments, settlements or awards;
>
> 2.    That portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law; and
>
> 3.    Punitive or exemplary damages to the extent such amounts are insurable under applicable law.
>
> **Damages** do not include:
>
> 4.    Fines or penalties;
>
> 5.    Sanctions;
>
> 6.    The return of fees or other consideration paid to the Insured;
>
> 7.    Matters uninsurable in the jurisdiction governing this Policy; or
>
> 8.    **Claims Expenses.**

38.    The 2013 Policy defines "Wrongful Act" as:

    1.   **Personal Injury**; or

    2.   Acts, errors or omissions,

arising out of the rendering or failure to render **Professional Services** by any Insured.

39.    The 2013 Policy's definition of "Professional Services" includes "services performed or advice given by the **Insured** in the **Insured's** practice of accountancy, financial planning and consulting[.]"

40.    Section V of the 2013 Policy, entitled "Who Is An Insured," states:

Each of the following is an Insured under this Policy to the extent set forth below:

A.   The person or organization designated as the Named Insured on the Declarations Page.

B.   Any **Predecessor Firm** or **Successor in Business.**

C.   Any past or present owner, partner, officer, director, stockholder, member, managing member or employee of any person or organization specified in Paragraphs A. or B. above, but only to **Professional Services** performed within the scope of their duties for that person or organization;

D.   Any non-affiliated person or accounting firm, who is not owned, controlled or affiliated with any person or organization specified in Paragraphs A. or B. above, including its owners, partners, officers, directors, members, managing members or employees, but only to **Professional Services** performed within the course and scope of their contract:

    1.   For you or on your behalf; or

    2.   For or on behalf of any **Predecessor Firm** or any **Successor in Business**.

E.   The estate, heirs, executors, administrators and legal representatives or any Insured stated in Paragraph A., B., C., or D. above in the event of the Insured's death, incapacity, insolvency, bankruptcy or receivership….

41.    Section VII of the 2013 Policy, entitled "Limits of Liability," states, in relevant

part:

D.    All related **Claims** or all **Claims** based on or arising from the same **Wrongful Act**, or a series of related **Wrongful Acts**, regardless of the number of Insureds, **Claims**, **Suits** filed, or person or organizations making **Claims** or filing **Suits**, will be considered a single **Claim** for the purpose of this insurance, and will be subject to the same **Limit of Liability** and **Deductible** amount, if applicable.  All such **Claims** will be considered first made when at the earliest of either:

1.    The date the first of such **Claims** was made against the Insured; or

2.    The date the Insured first reports to us of a potential **Claim** arising out of the **Wrongful Act.**

42.    Section IX of the 2013 Policy, entitled "Exclusions," provides in relevant part:

We have no obligation under this Policy to pay **Damages, Claims Expenses**, Legal Services Payments or Supplementary Payments or to provide a defense, in connection with any **Claim(s)** or **Suit(s), Legal Services Payment Request(s)** or **Supplemental Payment Request(s)**:

A.    Under any part of this Policy if based on or arising out of:

1.    **Fraud,   Criminal   or   Malicious   Acts,   Intentional Misrepresentation or Violation of Laws**
Except for covered **Dishonest Acts** by this Policy, any:

a.    Dishonest, fraudulent, criminal, knowingly wrongful, willful, malicious or intentional **Wrongful Act;**

b.    Intentional misrepresentation; or

c.    Willful, intentional or knowing violation of the laws, statutes, rules or regulations, including, but not limited to, the Racketeer Influenced and Corrupt Organizations Act (RICO), or other actual or alleged violations of state or federal anti-trust, price-fixing, restraint of trade or deceptive trade practice laws, rules or regulations.

However, this exclusion shall not apply to strictly vicarious liability of an innocent Insured, whose conduct, as stated in this exclusion, was not committed by, at the direction of, or with the knowledge of, such innocent Insured.

The Insured shall reimburse us for all **Claims Expenses** incurred if

the Insured's **Wrongful Act(s)** is found to be a conduct stated in this exclusion.

\*        \*        \*

6. **Persons Performing Professional Services for An Entity That Is Not A Named Insured**
   The rendering of or failure to render **Professional Services** by any Insured in their capacity as an employee, owner, partner, stockholder, director or officer of any sole proprietorship, partnership or corporation or other business enterprise which is not designated in this Policy as a Named Insured, **Predecessor in Business** or **Successor in Business**.

\*        \*        \*

12. **Unauthorized Use of Confidential Materials or Information**
    Any Insured's unauthorized use of confidential, privileged or non-public material or information for any purpose whatsoever.

43.   An Endorsement to the 2013 Policy, entitled "Exclusion – Professional Services By Specified Persons or Entities," states in pertinent part:

The following exclusion is added to Paragraph A. of **SECTION IX – EXCLUSIONS:**

A. Under any part of this Policy if based on or arising out of:

**Professional Services by Specified Persons or Entities**
Any **Wrongful Act** due to **Professional Services** performed by:

1. The Specified Persons or Entities listed in the Schedule below;

2. Any parent company, subsidiary, affiliate, predecessor, successor, assignee or other organization the Specified Persons or Entities are a subsidiary of, has acquired, participated in or with, formed, or over which the Specified Persons or Entities exercises current ownership or control; or

3. Any past, present or future partner, director, officer, principal, member, managing member, agent, subcontractor, independent contractor or employees while acting within the scope of their duties for, or in association with, the Specified Person or Entities or any of the parties stated in Paragraph 2. above.

Schedule of Specified Persons or Entities
\*        \*        \*

12

FSG Investment Management, LLC
*       *       *

44.     An Endorsement to the 2013 Policy, entitled "Exclusion – Professional Services For Specified Persons or Entities," states in pertinent part:

> The following exclusion is added to Paragraph A. of **SECTION IX – EXCLUSIONS:**
>
> A.   Under any part of this Policy if based on or arising out of:
>
> > **Professional Services for Specified Persons or Entities**
> > Any **Wrongful Act** from **Professional Services** performed by any Insured for the "Specified Persons or Entities" listed in the Schedule below, including but not limited to any partners, directors, officers, principals, members, managing members, agents, subcontractors, independent contractors or employees while acting in the scope of duties for such "Specified Persons or Entities" or its parent, subsidiaries, affiliates, predecessors, successors, assignees or any organization it acquired, participated in, or formed or over which it has current ownership or control.
> >
> > Schedule of Specified Persons or Entities
> > *       *       *
> > FSG Investment Management, LLC
> > *       *       *

45.     An Endorsement to the 2013 Policy, entitled "Exclusion – Specified Activities," states in pertinent part:

> The following exclusion is added to Paragraph A. of **SECTION IX – EXCLUSIONS:**
>
> A.   Under any part of this Policy if based on or arising out of:
>
> > **Specified Activities**
> > **Any Wrongful Act**, by or on behalf of any Insured, which are related to the Specified Activities listed in the Schedule below.
> >
> > Schedule of Specified Activities
> >
> > > Based on, arising out of or in connection with the design, recommendation, referral, sale or promotion of any transactions which:
> > >
> > > are determined by the IRS or state tax authorities to be a tax avoidance transaction or is substantially similar or abusive tax shelters or listed

transactions are identified as such by notice, regulation, or other guidance under the tax law;

or any tax transaction that is considered to be a reportable transaction under Treasury Regulation § 1.6011-4(b) or any superseding law or regulation

46.     Section XI of the 2013 Policy, entitled "General Conditions," provides in pertinent part:

> E.  **Conformity to Statute**
> In the event that any terms, conditions or exclusions of this Policy conflict with any law applicable to the coverage afforded hereunder, the terms of this Policy will, by this statement, be amended to conform to such law or laws.

47.     Section XI of the 2013 Policy, as amended by the Tennessee Amendatory Endorsement, states:

> L.  **Application and Declarations Page**
> By acceptance of this Policy, and as a condition precedent to coverage, all Insureds agree that:
>
> 1.  The statements in the **Application** are your agreements and representations;
>
> 2.  Each matter represented will be deemed material if it was made with actual intent to deceive or increases the risk of loss;
>
> 3.  This Policy is issued in reliance upon the truth of such representations; …

## The Underlying Lawsuit

48.     On or about October 9, 2012, Ronald K. Anderson, his wife Carmen Anderson, and three limited liability companies formed by the Anderson (the "Anderson Plaintiffs"), filed the Underlying Lawsuit in the Circuit Court of Shelby County, Tennessee against Defendants and others.  A copy of the Complaint in the Underlying Lawsuit is attached hereto as **Exhibit E**. The Underlying Lawsuit arises out of the Anderson Plaintiffs' use of the illegal DDS tax shelters

for the 2001 to 2002 tax years.  In addition to Defendants, the Anderson Lawsuit names BDO Seidman, L.L.P. ("BDO") and certain of its partners; the investment firm Gramercy Advisors, LLC, its affiliates (collectively, "Gramercy"), and its employees and members; and law firm De Castro, West, Chodorow, Glickfeld & Nass, Inc. ("De Castro") (collectively the "Anderson Defendants"), asserting that the Anderson Defendants jointly and in concert developed, designed, promoted, sold and implemented the DDS as part of a conspiracy to commit fraud on the Anderson Plaintiffs.

49.    The Underlying Lawsuit alleges that the DDS involved the contribution of distressed debt (generally assets trading substantially below their face value) from a foreign contributor to a U.S. partnership, and then the partnership would subsequently contribute the distressed debt to a lower-tier partnership.  The foreign entity would then sell its interest in the lower-tier partnership to a U.S. taxpayer, such as the Andersons, who would contribute assets to the partnership. The tax benefit is realized when the partnership sells or exchanges the contributed distressed assets for cash or other assets.

50.    The Underlying Lawsuit alleges that the DDS were jointly developed, designed, promoted, sold and implemented by FSG and BDO.  It further alleges that the Anderson Defendants, acting pursuant to an elaborate and carefully devised common scheme, counseled and advised the Anderson Plaintiffs to enter into the DDS, representing that the DDS provided an opportunity to yield a substantial profit and, at the same time, would legally minimize Plaintiffs' tax liability.  The Underlying Lawsuit further alleges that Anderson Defendants' primary motive in their pre-planned scheme was to exact significant fees from the Anderson Plaintiffs and other clients who executed a DDS.  The Underlying Lawsuit alleges that the Anderson Defendants knew, at the time they promoted and sold the DDS to the Anderson Plaintiffs, that federal

authorities were investigating similar tax-reducing investment strategies and the conduct of the promoters of these strategies.

51.     According to the Complaint, Defendants Shaul and Paessler introduced the DDS to Ronald Anderson in 2001 and convinced him to execute the DDS.  Defendants identified the Anderson Plaintiffs as potential clients for the DDS by using "confidential knowledge of Plaintiffs' financial situation to target Plaintiffs" as potential victims of the DDS scheme. Defendants introduced the Anderson Plaintiffs to BDO, who presented and promoted the DDS to Anderson.   The Underlying Complaint alleges that Defendants and/or BDO advised the Anderson Plaintiffs to enter into the DDS, representing that the DDS provided an opportunity to yield a substantial profit and, at the same time, would legally minimize Plaintiffs' tax liability.

52.     The Underlying Complaint alleges that the Defendants' primary motive in their pre-planned scheme was to exact significant fees from the Anderson Plaintiffs and other clients who executed a DDS.  The Anderson Defendants knew, at the time they promoted and sold the DDS to the Anderson Plaintiffs, that federal authorities were investigating similar tax-reducing investment strategies and the conduct of the promoters of these strategies.   The Complaint alleges that the Anderson Defendants knew or should have known that the IRS would disallow the DDS as illegal and abusive tax shelters and assess clients such as the Anderson Plaintiffs with back taxes, interest, and penalties.

53.     The Anderson Plaintiffs alleged that they engaged the DDS through BDO for the 2001 and 2002 tax years.  The Anderson Plaintiffs engaged Gramercy as investment managers to implement the DDS, and De Castro and another law firm, Proskauer Rose LLP ("Proskauer"), provided allegedly independent legal opinions that the DDS was legal, complied with all applicable tax laws, and would withstand scrutiny by the IRS.  The Underlying Lawsuit alleges

that, in working closely with one another to execute the pre-planned fraudulent scheme, the Anderson Defendants knew that the DDS were illegal and abusive tax shelters.

54.     The Underlying Lawsuit alleges that, at no time prior to the implementation of the DDS, did the Anderson Defendants advise the Anderson Plaintiffs that the IRS contended that such transactions constituted illegal and abusive tax shelters within the meaning of IRS Code 26 U.S.C. § 6111, and that the Anderson Defendants were therefore illegally promoting an unregistered tax shelter.  At this time, the Anderson Defendants knew or should have known the IRS would conclude that the DDS was an illegal and abusive tax shelter that violated, among other things, the partnership anti-abuse rules under Treas. Reg. §1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other applicable tax laws, regulations, and common law doctrines.

55.     The Underlying Lawsuit alleged that BDO and/or Gramercy paid FSG part of the fees that the Anderson Plaintiffs paid to them for FSG's assistance in targeting the Anderson Plaintiffs and working closely with the other Anderson Defendants to market, sell, and implement the DDS.

56.     The Underlying Lawsuit alleges that Defendants prepared the federal tax returns for the three limited liability companies involved in the execution of the DDS.  Based upon the advice of BDO and FSG, among other things, the Anderson Plaintiffs filed tax returns for 2001 and 2002 that included losses generated by the 2001 to 2002 DDS.

57.     The Underlying Lawsuit further alleges that, following the inclusion of losses from the 2001 and 2002 DDS in Plaintiffs' tax returns, on March 13, 2006, the IRS issued a Notice of Beginning Administrative Proceeding for Anderson Plaintiff Danty LLC (one of the

limited liability companies created for the DDS) for the 2001 and 2002 tax years. On October 17, 2011, the IRS issued a Notice of Final Partnership Administrative Adjustment to Danty LLC that disallowed the DDS as an illegal and abusive tax shelter, disallowed the losses purportedly created by the DDS, and assessed the Anderson Plaintiffs with substantial back-taxes, interest, and penalties as a direct result of their participation in the 2001 to 2002 DDS.

58.     Based upon the foregoing allegations and others, the Underlying Lawsuit asserts ten causes of action against FSG, FSGIM, Shaul, Paessler and Parham and the other defendants: (1) breach of fiduciary duty; (2) negligence and gross negligence; (3) negligent misrepresentation; (4) disgorgement of fees; (5) declaratory judgment and unjust enrichment; (6) rescission; (7) fraud; (8) civil conspiracy; (9) aiding and abetting; and (10) breach of contract. The Anderson Plaintiffs seek compensatory damages of $16.5 million and punitive and exemplary damages of $49.5 million, consequential and incidental damages, prejudgment interest, attorney's fees and costs, and rescission of the various investment, advisory and/or consulting agreements with various defendants.

59.     The Defendants tendered the Underlying Lawsuit to General Star on or about October 23, 2013, and Defendants requested that General Star provide a defense and indemnification to the Anderson Lawsuit pursuant to the 2013 Policy.

60.     By letter dated November 18, 2013, General Star denied coverage for the Anderson Lawsuit.

**The Underlying Lawsuit is Virtually Identical to Prior Lawsuits Against FSG**

61.     Prior to the Policy Period of either the 2012 Policy or the 2013 Policy, FSG was named as a defendant in a lawsuit filed by Shahid R. Khan and others on July 5, 2009 in the Circuit Court of Champaign County, Illinois, styled *Shahid R. Khan, et al. v. BDO Seidman,*

*L.L.P., et al.*, case no. 09L139 (the "Khan Lawsuit"), which asserted essentially the same facts and allegations as the Underlying Lawsuit.  The Khan Lawsuit alleges that FSG participated in an illicit fee generating scheme to place clients in the DDS, despite knowing that it was an illegal and abusive tax shelter that would be disallowed by the IRS.

62.     The Complaint in the Khan Lawsuit, a copy of which is attached hereto as **Exhibit F**, names the same cast of characters as the Underlying Lawsuit: BDO, Gramercy, De Castro, FSG and certain of their employees and/or partners (the "Khan Defendants").  The plaintiffs in the Khan Lawsuit – Mr. Khan, his wife, and the companies formed for purposes of implementing the DDS (the "Khan Plaintiffs") – sought damages arising out of their execution of the DDS in 2002 and 2003 and claiming losses therefrom on their tax returns for 2002 and 2003.

63.     The Khan Lawsuits alleged that BDO recommended that Khan engage in the DDS, which would provide Plaintiffs with an above-average return on their investment and, at the same time, legally minimize the Khan Plaintiffs' taxes.  BDO also recommended that Khan work with Gramercy to handle the foreign distressed investments, and BDO recommended that Khan engage De Castro to issue a legal opinion for the DDS.  Based upon discussions and representations by BDO, Gramercy and De Castro, Khan engaged in the DDS for 2002 and 2003.

64.     Similar to the Underlying Lawsuit, the Khan Lawsuit alleged that FSG prepared and signed the 2002 and 2003 federal tax returns for the limited liability company formed by Khan to implement the DDS utilizing the losses purportedly generated by the DDS, and provided the Khan Plaintiffs with copies of the returns.  Based upon these returns, among other documents, the Khan Plaintiffs filed their individual federal tax returns for 2002 and 2003, which included the losses generated by the 2002 and 2003 DDS.

65.     The Khan Lawsuit alleges that, at no time prior to or subsequent to the Khan

Plaintiffs' implementation of the 2002 and 2003 DDS, did the Khan Defendants inform them that the IRS contended that such transactions constituted tax shelters within the meaning of IRS Code § 6111 or otherwise, and that the Khan Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2002 and 2003 DDS to Khan.  At this time, the Khan Defendants knew or should have known that the IRS would conclude that the 2002 and 2003 DDS was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. §1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities.

66.     The Khan Lawsuit alleges that the Khan Plaintiffs received a Notice of Audit (Notice of Beginning of Administrative Proceeding) for their 2002 and 2003 tax returns in 2005 and 2006.  In 2008, the IRS disallowed the Khan Plaintiffs' 2002 and 2003 DDS and determined that they owed substantial back-taxes, interest, and penalties as a direct result of their participation in the 2002 and 2003 DDS.

67.     FSG was also named as a defendant in a lawsuit filed by R.K. Lowry Jr. and others in 2008 in the 80th Judicial District Court of Harris County, Texas, captioned *RK Lowry, Jr. et al. v. BDO Seidman LLP, et al.*, case no. 2008- 74262. Defendants have represented that the Lowry Lawsuit is "similar" to the Khan Lawsuit.  Upon information and belief, the Lowry Lawsuit includes similar allegations that FSG prepared tax returns for Plaintiffs that sustained alleged losses from implementing BDO's DDS illegal tax shelter scheme.

68.     After the 2012 Policy was issued (but before the 2013 Policy was issued) another lawsuit, captioned *Alan J. Kaufman, et al. v. BDO Seidman, L.L.P., et al.*, case no. 12 L 13292, was filed on or about November 27, 2012 in the Circuit Court of Cook County, Illinois, (the

"Kaufman Lawsuit") against FSG and others by Alan J. Kaufman, his wife, Sue E. Kaufman, and three limited liability companies formed by the Kaufmans (the "Kaufman Plaintiffs").  A copy of the Complaint in the Kaufman Lawsuit is attached hereto as **Exhibit G**.

69.     In general, the Kaufman Lawsuit asserts that BDO designed the DDS, which involved a scheme to reduce tax liability by investing in foreign distressed debt.  BDO sold the DDS to the Kaufman Plaintiffs for the tax years 2002 to 2004, convincing the Kaufman Plaintiffs to implement the DDS based upon BDO's recommendation and the legal opinions issued by Proskauer and De Castro that that the DDS were legal, complied with all applicable tax laws, and would withstand scrutiny by the IRS.  Once the Kaufman Plaintiffs elected to implement the DDS, Gramercy executed the "investment" component of the DDS.  The Complaint alleges that the Kaufman Defendants, including FSG, knew or should have known that the IRS would disallow the DDS as illegal and abusive tax shelters and assess the clients such as the Kaufman Plaintiffs with back taxes, interest, and penalties.

70.     Specific to FSG, the Kaufman Complaint further alleges that, despite knowing that the IRS would more than likely disallow the DDS as illegal and abusive tax shelters, FSG prepared and signed the 2002 to 2004 federal tax returns for three limited liability companies involved in the execution of the DDS.  Copies of these federal tax returns were provided to the Kaufman Plaintiffs.  Mr. and Mrs. Kaufman relied upon these returns to prepare their individual returns, which contained the losses generated by the 2002 to 2004 DDS. The IRS subsequently audited the Kaufman Plaintiffs for the 2002 to 2004 tax years, disallowed the losses generated by the DDS and assessed the Kaufman Plaintiffs with substantial back-taxes, interest, and penalties as a direct result of their participation in the 2002 to 2004 DDS.  As in the Underlying Lawsuit, the Kaufman Plaintiffs brought causes of action against FSG and its officers alleging breach of

fiduciary duty, negligence, fraud, civil conspiracy, disgorgement of fees, unjust enrichment and aiding and abetting.

<u>COUNT I</u>
<u>Declaratory Judgment that there is No Coverage Under the 2013 Policy for the Underlying Lawsuit Based on the Insureds' Prior Notice</u>

71.     General Star restates and re-alleges Paragraphs 1 through 70 of this Complaint for Declaratory Judgment as if fully set forth herein.

72.     The Insuring Agreement of the 2013 Policy, among other terms, provides that coverage is only available for Claims arising out of a Wrongful Act that takes place "prior to the **Policy Period** if … at the Inception Date of the **Policy Period**, no Insured knew of any **Wrongful Act** that may reasonably be expected to give rise to a **Claim** or **Suit** against an Insured."

73.     The Underlying Lawsuit is a Claim, as that term is defined by the 2013 Policy.

74.     The Underlying Lawsuit arises out of Wrongful Acts that took place prior to the Policy Period of the 2013 Policy.  Specifically, the Underlying Lawsuit alleges acts, errors or omissions by Defendants in the referral of the Anderson Plaintiffs to BDO for purposes of selling the DDS, the preparation of tax returns for the tax years 2001 to 2002 which included losses realized from the DDS, and the failure to advise the Anderson Plaintiffs that the DDS was an illegal and abusive tax shelter that would be disallowed by the IRS.

75.     Coverage under the 2013 Policy is not triggered for the Underlying Lawsuit because an Insured knew of a Wrongful Act, *i.e.,* an act, error or omission arising out of the rendering or failure to render Professional Services by any Insured that may reasonably be expected to give rise to a Claim or Suit against an Insured.

76.     Specifically, prior to the inception of the 2013 Policy, FSG and/or Defendants

22

were aware of the following facts and circumstances:

     a.  That at least one of their clients, Mr. Anderson, was audited and investigated by the IRS in 2004 and 2005 for filing tax returns prepared and approved by FSG that incorporated losses generated by the DDS, and that the IRS was challenging the losses generated by the DDS;

     b.  That at least one of their clients, Mr. Anderson, had retained counsel in 2005 or 2006 to defend him in response to the IRS' investigation into his filing tax returns prepared and approved by FSG that incorporated losses generated by the DDS;

     c.  By documents submitted by the IRS in connection with the audit of Mr. Anderson and/or the allegations of the Khan, Lowry and Kaufman Lawsuits, that the IRS determined that the DDS was an illegal and abusive tax shelter, that the IRS had disallowed the losses taxpayers claimed on their tax returns as a result of implementing the DDS, and that taxpayers that submitted tax returns incorporating losses generated by implementing the DDS were assessed back taxes, fines and penalties by the IRS;

     d.  That the United States Department of Justice ("DOJ") investigated the legality of BDO's involvement with DDS transactions, and that one or more of FSG's partners had been deposed by the DOJ in connection with that investigation;

     e.  Either through its involvement with the DOJ, through press reports, or through the allegations of and its involvement in the Khan, Lowry and Kaufman Lawsuits, that, in 2009, several former BDO partners responsible for the design, promotion, sale and implementation of BDO tax-reducing investment strategies, including the DDS, pled guilty to criminal charges based, in part, on their admitted involvement from approximately 1998 to 2003 in a conspiracy to defraud the United States, commit tax evasion, aid and assist in the preparation of false and fraudulent income tax returns, and obstruct and impede due administration of the internal revenue laws, all in connection with the design, marketing, and implementation of tax shelter transactions, including the DDS, while acting as principals of BDO, and that another former BDO principal was convicted of fraud and civil conspiracy to commit fraud, in 2011;

     f.  Either through its involvement with the DOJ, through press reports, or through the allegations of and its involvement in the Kaufman, Khan and Lowry Lawsuits, that, in June 2012, BDO entered into a Deferred Prosecution Agreement with the DOJ and agreed to pay a promoter penalty of $50 million as a result of BDO's involvement in a "massive fraud" by designing, marketing, selling and implementing illegal and abusive tax shelters, including the DDS, and that BDO admitted in the Agreement that "BDO and its co-conspirators developed, marketed, sold and implemented illegal tax shelter products targeted to wealthy clients;"

     g.  By receipt of the Khan and Lowry Lawsuits and by tendering such lawsuits to a

prior insurance carrier for coverage, that it had been sued by at least two taxpayers for FSG's role in preparing tax returns for the companies created by the taxpayers for the purpose of implementing the DDS that incorporated losses generated by the DDS; and

h.   At the time that it applied for the 2013 Policy, that it had prepared tax returns for other taxpayers and/or clients aside from those identified in the Khan, Lowry and Kaufman Lawsuits that incorporated losses generated by the taxpayer's implementation of the DDS.

77.   Based on these facts, a reasonable person in Defendants' position knew of acts, errors or omissions arising out of the rendering or failure to render Professional Services by any Insured that may reasonably be expected to give rise to a Claim or Suit against an Insured. Indeed, acts, errors or omissions identical to those alleged in the Underlying Lawsuit had previously resulted in Claims and Suits against FSG.

78.   Because FSG knew of acts, errors or omission that may reasonably be expected to give rise to a Claim or Suit against an Insured, coverage is not triggered under the 2013 Policy for the Underlying Lawsuit.  Accordingly, General Star is entitled to a declaration that it owes no duty to defend or indemnify Defendants in connection with the Underlying Lawsuit.

## COUNT II

### Declaratory Judgment that There Is No Coverage under the 2013 Policy for the Underlying Lawsuit Because it Was Not a Claim First Made During the Policy Period

79.   General Star restates and re-alleges paragraphs 1 through 78 of this Complaint for Declaratory Judgment as if fully set forth herein.

80.   The Insuring Agreement of the 2013 Policy only provides coverage for Claims first made and reported during the Policy Period (or during a short period thereafter).  The Policy Period for the 2013 Policy is September 17, 2013 to September 17, 2014.

81.   The Underlying Lawsuit, the Khan Lawsuit, and the Lowry Lawsuit are all Claims, as that term is defined under the 2013 Policy.

24

82.     The Khan Lawsuit was made in 2009 when the suit was filed and served upon FSG.

83.     Upon information and belief, the Lowry Lawsuit was made in 2008 when the suit was filed and served upon FSG.

84.     The 2013 Policy further provides that all related Claims or all Claims based on arising out of the same Wrongful Act, or a series of related Wrongful Acts, will be considered a single Claim, first made at the earliest of the date the first Claim was made against the Insured or the date the Insured first reports a potential claim to General Star.

85.     The Underlying Lawsuit, the Khan Lawsuit and the Lowry Lawsuit are all based on or arising from the same Wrongful Act or series of related Wrongful Acts.  All of these suits stem from the Insureds' involvement in the identical common scheme with BDO, Gramercy, De Castro, and Proskauer to create, market, sell and implement the DDS to earn professional fees, the Insureds' preparation of tax returns that took advantage of losses generated by the DDS and the taxpayer's reliance on same, and the Insureds' failure to advise the taxpayer that the DDS was an illegal and abusive tax shelter that would be disallowed by the IRS.

86.     Pursuant to the language of the 2013 Policy, the Underlying Lawsuit shall be considered first made in 2008 or 2009 when the claim from the Lowry and Khan Lawsuits were first made.

87.     Because the Underlying Lawsuit is not a Claim first made and reported during the Policy Period of the 2013 Policy, coverage is not triggered under the 2013 Policy for the Underlying Lawsuit.  Accordingly, General Star is entitled to a declaration that it owes no duty to defend or indemnify Defendants in connection with the Underlying Lawsuit.

**COUNT III**

25

**Declaratory Judgment that Coverage for the Underlying Lawsuit Is Excluded Pursuant to the 2013 Policy Specified Activities Exclusion**

88.     General Star restates and re-alleges paragraphs 1 through 87 of this Complaint for Declaratory Judgment as if fully set forth herein.

89.     The Specified Activities Exclusion in the 2013 Policy excludes coverage for any Claim or Suit based on or arising out of any Wrongful Act, by or on behalf of any Insured, based on, arising out of or in connection with the design, recommendation, referral, sale or promotion of any transaction which a) are determined by the IRS to be, or substantially similar to, a tax avoidance transaction, abusive tax shelter, or listed transaction, identified by notice, regulation or other guidance under the tax law, or b) is considered to be a reportable transaction under Treasury Regulation §1.6011-4(b) or any superseding law or regulation.

90.     The Underlying Lawsuit alleges that Defendants recommended the DDS to the Anderson Plaintiffs, referred the Anderson Plaintiffs to BDO to implement the DDS, and promoted the DDS to the Anderson Plaintiffs.  The Underlying Lawsuit further alleges that the IRS identified the DDS as an illegal and abusive tax shelter in its October 7, 2011 Notice of Final Partnership Administrative Adjustment.  The Underlying Lawsuit also alleges that DDS was a reportable transaction under Treasury Regulation §1.6011-4(b).

91.     Coverage for the Underlying Lawsuit is excluded pursuant to the terms of the Specified Activities Exclusion under the 2013 Policy. Accordingly, General Star is entitled to a declaration that it owes no duty to defend or indemnify Defendants in connection with the Underlying Lawsuit.

**COUNT IV**

**Declaratory Judgment that Coverage for the Underlying Lawsuit Is Excluded Pursuant to the 2013 Policy's Fraud, Criminal or Malicious Acts Exclusion and Confidential Information Exclusion**

92.     General Star restates and re-alleges paragraphs 1 through 91 of this Complaint for Declaratory Judgment as if fully set forth herein.

93.     The 2013 Policy excludes coverage for Claims based on or arising out of dishonest, fraudulent, criminal, knowingly wrongful, willful, malicious or intentional Wrongful Acts; intentional misrepresentations; or willful, intentional or knowing violation of the laws, statutes, rules or regulations.

94.     The Underlying Lawsuit alleges that Defendants committed dishonest, fraudulent, criminal, knowingly wrongful, willful, malicious or intentional Wrongful Acts; intentional misrepresentations; or willful, intentional or knowing violation of the laws, statutes, rules or regulations.

95.     Specifically, the Underlying Lawsuit alleges that Defendants entered into a civil conspiracy with BDO and other parties to fraudulently promote the DDS to high net worth individuals such as the Andersons.

96.     The Underlying Lawsuit further alleges that Defendants intentionally and fraudulently misrepresented the legality of the DDS in order to induce the Andersons to engage the DDS, all the while knowing that the DDS was an illegal and abusive tax shelter that would disallowed by the IRS.

97.     Therefore, because the Underlying Lawsuit is based on or arises out of dishonest, fraudulent, criminal, knowingly wrongful, willful, malicious or intentional Wrongful Acts, intentional misrepresentations, or willful, intentional or knowing violation of the laws, statutes, rules or regulations, coverage is excluded under the 2013 Policy.

98.     The 2013 Policy also excludes coverage for any Claim based on or arising out of any Insured's unauthorized use of confidential, privileged, or non-public material or information

for any purpose whatsoever.

99.     The Underlying Lawsuit is based on or arises out of the Insured's unauthorized use of confidential, non-public information.  Specifically, the Underlying Lawsuit alleges that FSG and its principals, Shaul and Paessler, were the Anderson Plaintiffs' long-time accountants and financial advisors, and had confidential knowledge of the Andersons' financial situation, which they used to identify and target the Anderson Plaintiffs for the DDS.  Coverage under the 2013 Policy, therefore, is excluded pursuant to the Confidential Information Exclusion.

100.     Accordingly, General Star is entitled to a declaration that it owes no duty to defend or indemnify Defendants under the 2013 Policy in connection with the Underlying Lawsuit pursuant to the Fraud, Criminal or Malicious Acts Exclusion and Confidential Information Exclusion.

## COUNT V

### Declaratory Judgment that FSGIM is not an Insured under the 2013 Policy, and/or any coverage for FSGIM is Excluded under the 2013 Policy

101.     General Star restates and re-alleges paragraphs 1 through 100 of this Complaint for Declaratory Judgment as if fully set forth herein.

102.     Section V of the 2013 Policy identifies those specific entities or individuals that are considered Insureds under the Policy.  Neither Section V nor the Declarations Page identifies FSGIM as an Insured, and FSGIM does not fall within any of the enumerated paragraphs of Section V.

103.     Because FSGIM is not an Insured under the 2013 Policy, there is no coverage for FSGIM and its employees and representatives under the 2013 Policy.  Therefore, General Star is entitled to a declaration that it owes no duty to defend or indemnify FSGIM or its employees and representatives in connection with the Underlying Lawsuit.

104.     Furthermore, the  2013 Policy's "Professional Services By Specified Persons or Entities" Exclusion bars coverage for any Claim or Suit based on or arising out of any Wrongful Act due to Professional Services performed by FSGIM.   The 2013 Policy's "Professional Services For Specified Persons or Entities" similarly bars coverage for any Claim or Suit based on or arising out of any Wrongful Act from Professional Services performed by any Insured for FSGIM.  The 2013 Policy's "Specified Activities" Exclusion bars coverage for any Claim or Suit based on or arising out of any Wrongful Act by or on behalf of any Insured related to financial investment and planning referrals to FSGIM.   Finally, Exclusion 6 of the 2013 Policy bars coverage for any Claim or Suit based on or arising out of the rendering or failure to render Professional Services by any Insured in their capacity as an employee, owner, partner, stockholder, direct or officer of any business not designated in the Policy as a Named Insured, Predecessor in Business, or Successor in Business.

105.     Accordingly, to the extent that the Underlying Lawsuit involves Wrongful Acts performed by FSGIM, or performed by any Insured for FSGIM or related to financial investment and planning referrals to FSGIM, or to the extent that the Underlying Lawsuit is based on or arises out of any Insured's Professional Services as a representative of FSGIM, coverage is excluded and General Star owes no duty to defend or indemnify FSGIM or any such Insured.

## COUNT VI

### Declaratory Judgment that there is No Coverage for any portion of the Underlying Lawsuit that is not a "Claim," that seeks an award that is not "Damages," or for Punitive Damages

106.     General Star restates and re-alleges paragraphs 1 through 105 of this Complaint for Declaratory Judgment as if fully set forth herein.

107.     The 2013 Policy only provides coverage for "Claims," as that term is defined in the Policy.   The definition of Claim expressly states that it does not include that portion of a

proceeding seeking monetary relief that seeks injunctive or other non-pecuniary relief.

108.    In addition to money damages, the Underlying Lawsuit seeks other non-pecuniary relief, such as declaratory judgment.  As such, coverage does not apply to any portion of the Underlying Lawsuit that seeks non-pecuniary relief.

109.    Even if coverage exists (which it doesn't), the 2013 Policy only entitles the Insured to indemnity for "Damages."  The definition of "Damages" in the 2013 Policy expressly states that it does not include fines, penalties, sanctions, the return of fees or other consideration paid to the Insured, or matters uninsurable in the jurisdiction governing the policy.

110.    The Underlying Lawsuit seeks reimbursement of fees or other consideration paid to the Insured.  As such, General Star has no duty to indemnify Defendants for any amounts they are obligated to pay that represent the return of fees or other consideration paid to Defendants.

111.    Tennessee law holds that coverage under an insurance policy is prohibited for punitive damages arising from intentional conduct.

112.    The Underlying Lawsuit seeks punitive damages against Defendants arising from their intentional conduct.  As such, General Star has no duty to indemnify Defendants for any award of punitive damages.

113.    Accordingly, General Star is entitled to a declaration that it owes no duty to defend or indemnify Defendants in connection with the portions of the Underlying Lawsuit that seek non-pecuniary relief.  General Star is also entitled to a declaration that it owes no duty to indemnify Defendants for any amounts Defendants are obligated to pay that represent the return of fees or other consideration paid to Defendants or punitive damages.

## **COUNT VII**

### **Declaratory Judgment for Rescission of the 2013 Policy Based upon Material Misrepresentations in the Application Materials**

114.    General Star repeats and realleges paragraphs 1 through 113 of this Complaint for Declaratory Judgment as if fully set forth herein.

115.    In the Application, which FSG submitted to General Star in 2012 for purposes of obtaining the 2012 Policy, FSG affirmatively represented that, within the past 10 years, neither it nor its personnel received fees or reciprocity in connection with the design, recommendation, sale or promotion of any income tax transaction which:

a.  is specifically identified by the IRS as a tax avoidance transaction ('listed transaction') or is substantially similar to abusive tax shelters or transactions listed under the IRS Code?
b.  Or, any income tax transaction that is considered a reportable transaction under Treasury Regulation §1.6011-4?

116.    FSG also affirmatively represented in the Application that, after inquiry of all owners, partners, officers and professionals of the firm, no past or present personnel had become aware in the past year of any act, omission, circumstances or fee dispute which might be expected to be the basis of a claim or suit.

117.    In the Bridge Application, which FSG submitted to General Star in 2012 for purposes of obtaining the 2012 Policy, FSG affirmatively represented that it made a "comprehensive internal inquiry or investigation to determine whether any Applicant firm accountant is aware of any event, circumstance, situation or transaction that could reasonably be expected to result in a claim, and have fully and completely divulged any and all situations to [General Star]."  FSG did not disclose any event, circumstance, situation or transaction that could reasonably be expected to result in a claim prior to the issuance of the 2012 Policy.

118.    FSG's duly authorized representative signed the Application and Bridge Application.  In doing so, FSG expressly represented that the statements therein were true, accurate and complete, that no material facts had been suppressed or misstated, that FSG

understood and acknowledged that the 2012 Policy was issued in reliance upon the truth of such representations, and that such representations were incorporated into and made part of the 2012 Policy.

119.    In the Renewal Application, which FSG submitted to General Star in 2013 for purposes of obtaining the 2013 Policy, General Star inquired about whether there was a change in circumstances regarding representations previously made by FSG in the Application and Bridge Application.  The instructions to the Renewal Application directed FSG to respond "no change" if the response to the question had not changed in the last 12 months, and to respond "yes" if new information existed or if information existed not previously reported to General Star.

120.    FSG responded "no change" to questions regarding whether it a) received commissions, referral fees, reciprocity arising from the sale, promotion or recommendation of securities, insurance products, real estate or other investments; and b) knew of any circumstances which may result in a claim being made.

121.    FSG's duly authorized representative signed the Renewal Application.  In doing so, FSG expressly represented that the information provided therein was true, and that FSG understood that an incorrect or incomplete statement could void the insurance policy.

122.    FSG's statement, answer and representation in the Renewal Application that there was "no change" in its prior representations as to whether it received commission, referral fees, reciprocity arising from the sale, promotion or recommendation of securities, insurance products, real estate or other investments was false.

123.    Specifically, FSG and its partners had knowledge that it received fees from BDO and/or Gramercy related to the recommendation, sale or promotion of the DDS to the Anderson

Plaintiffs, which was not previously disclosed to General Star.

124.    FSG's statement, answer and representation in the Renewal Application that there was "no change" in whether it knew of any circumstances which may result in a claim being made was also false.

125.    Specifically, FSG and its partners were aware of the following facts and circumstances prior to submitting the Renewal Application, none of which were disclosed to General Star:

a.  That at least one of their clients, Mr. Anderson, was audited and investigated by the IRS in 2004 and 2005 for filing tax returns prepared and approved by FSG that incorporated losses generated by the DDS, and that the IRS was challenging the losses generated by the DDS;

b.  That at least one of their clients, Mr. Anderson, had retained counsel in 2005 or 2006 to defend him in response to the IRS' investigation into his filing tax returns prepared and approved by FSG that incorporated losses generated by the DDS;

c.  By documents submitted by the IRS in connection with the audit of Mr. Anderson and/or the allegations of the Khan, Lowry and Kaufman Lawsuits, that the IRS determined that the DDS was an illegal and abusive tax shelter, that the IRS had disallowed the losses taxpayers claimed on their tax returns as a result of implementing the DDS, and that taxpayers that submitted tax returns incorporating losses generated by implementing the DDS were assessed back taxes, fines and penalties by the IRS;

d.  That the United States Department of Justice ("DOJ") investigated the legality of BDO's involvement with DDS transactions, and that one or more of FSG's partners had been deposed by the DOJ in connection with that investigation;

e.  Either through its involvement with the DOJ, through press reports, or through the allegations of and its involvement in the Khan, Lowry and Kaufman Lawsuits, that, in 2009, several former BDO partners responsible for the design, promotion, sale and implementation of BDO tax-reducing investment strategies, including the DDS, pled guilty to criminal charges based, in part, on their admitted involvement from approximately 1998 to 2003 in a conspiracy to defraud the United States, commit tax evasion, aid and assist in the preparation of false and fraudulent income tax returns, and obstruct and impede due administration of the internal revenue laws, all in connection with the design, marketing, and implementation of tax shelter transactions, including the DDS, while acting as principals of BDO, and that another former BDO principal was convicted of fraud and civil conspiracy to commit fraud, in 2011;

f.  Either through its involvement with the DOJ, through press reports, or through the allegations of and its involvement in the Kaufman, Khan and Lowry Lawsuits, that, in June 2012, BDO entered into a Deferred Prosecution Agreement with the DOJ and agreed to pay a promoter penalty of $50 million as a result of BDO's involvement in a "massive fraud" by designing, marketing, selling and implementing illegal and abusive tax shelters, including the DDS, and that BDO admitted in the Agreement that "BDO and its co-conspirators developed, marketed, sold and implemented illegal tax shelter products targeted to wealthy clients;"

g.  By receipt of the Khan and Lowry Lawsuits and by tendering such lawsuits to a prior insurance carrier for coverage, that it had been sued by at least two taxpayers for FSG's role in preparing tax returns for the companies created by the taxpayers for the purpose of implementing the DDS that incorporated losses generated by the DDS; and

h.  At the time that it submitted the Renewal Application, that it had prepared tax returns for other taxpayers and/or clients aside from those identified in the Khan, Lowry and Kaufman Lawsuits incorporating losses generated by the taxpayer's implementation of the DDS.

126.  Someone in FSG's position should anticipate that the foregoing circumstances may result in a claim being made.  Indeed, someone in FSG's position should have reasonably anticipated that it could be sued by any taxpayer that implemented the DDS and for which FSG had any involvement, either by recommending the taxpayer to BDO to implement the DDS (like the Anderson Plaintiffs), or simply by preparing tax returns for one of the limited liability companies created to implement the DDS.

127.  General Star relied upon FSG's misrepresentations in the Application, the Bridge Application, and the Renewal Application in approving FSG for the 2013 Policy and issuing the 2013 Policy to FSG.

128.  FSG's misrepresentations of fact in the Application, Bridge Application and Renewal Application were material.  In accepting the 2013 Policy, FSG agreed that all statements in the Renewal Application were its agreements and representations, will be deemed material if it was made with actual intent to deceive or increases the risk of loss, and that the

2013 Policy was issued in reliance upon the truth of such representations.

129.   Such statements were also material because the matter misrepresented increased the risk of loss to General Star and influenced General Star's judgment in making the insurance contract.  Had General Star known the truth, General Star would have rejected the risk and would not have issued the 2013 Policy, or it would have only issued the 2013 Policy with an increased premium and an endorsement specifically excluding coverage for claims arising out of the DDS and the Insured's preparation of tax returns incorporating losses generated by the DDS.

130.   General Star will tender the premium paid for the Policy to the Court at or before trial or to FSG upon rescission of the 2013 Policy, subject to an offset for payments made by General Star on behalf of any Insured in defense of any claims for which coverage was provided under the 2013 Policy.

131.   Because FSG made material misrepresentations in the Renewal Application for the 2013 Policy, the 2013 Policy is void *ab initio* and of no effect whatsoever.

WHEREFORE, Plaintiff, GENERAL STAR NATIONAL INSURANCE COMPANY, respectfully requests that judgment be entered in its favor and against the Defendants, and prays that this Court enter an order declaring that:

a)   General Star has no duty to defend or indemnify Defendants or any other entity or individual in connection with the Anderson Lawsuit;

b)   The 2013 Policy is void *ab initio* and of no effect whatsoever based on the material misrepresentations made by the Insureds in the applications for the policy;

d)   General Star shall be awarded costs in this action; and

e)   Order any such further relief as this Court may deem just and appropriate.

### **JURY DEMAND**

General Star hereby demands trial by jury.

LEWIS, THOMASON, KING,
KRIEG & WALDROP, P.C.

 /s/ Justin Joy_____
WILLIAM H. HALTOM, JR., (TN BPR #6361)
     WHaltom@LewisThomason.com
JUSTIN N. JOY (TN BPR #023722)
     JJoy@LewisThomason.com
2900 Once Commerce Square
40 South Main Street
Memphis, Tennessee  38103
(901) 525-8721


and

Christopher T. Conrad (to be admitted *pro hac vice*)
Benjamin W. Tull (to be admitted *pro hac vice*)
WILFORD CONRAD LLP
18 East Dundee Road
Building 6, Suite 150
Barrington, Illinois 60010
(224) 848-4721
Fax: (224) 425-5865
cconrad@wilfordconrad.com
btull@wilfordconrad.com

*Attorneys for Plaintiff, GENERAL STAR*
*NATIONAL INSURANCE COMPANY*